IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

DAVID DIXON,                                    )
JEFFREY ROZELLE,                                )
AARON THURMAN, and                              )
RICHARD ROBARDS,                                )
On behalf of themselves and all                 )
others similarly situated,                      )
                                                )
        Plaintiffs,                             )
                                                )
v.                                              )
                                                )
CITY OF ST. LOUIS, SHERIFF VERNON               )        Cause No.
BETTS, JUDGE ROBIN RANSOM in her                )
official capacity as presiding judge, JUDGE     )
REX BURLISON in his official capacity as        )
interim Presiding Judge, JUDGE ELIZABETH        )
HOGAN in her official capacity as Division 16   )
Judge and Duty Judge, JUDGE DAVID               )
ROITHER in his official capacity as Division 25 )
Judge and Duty Judge, JUDGE THOMAS              )
MCCARTHY in his official capacity as            )
Division 26 Judge, COMMISSIONER DALE            )
GLASS in his official capacity as St. Louis     )
Commissioner of Corrections,                    )
                                                )
        Defendants.                             )

## CLASS ACTION COMPLAINT

1.      Every day in the City of St. Louis, presumptively innocent individuals remain in jail simply because they are too poor to pay for their freedom. Hundreds of people—the vast majority of whom are poor and Black—are condemned to remain confined in jail for weeks, months, or even years. They are locked in jail until they either have their day in court or, more likely, accept a plea that allows them to escape custody and return to their lives. This system inflicts devastating harm on people solely because of their poverty and violates the most fundamental of American axioms, that all people are equal under the law.

2. The Defendant Judges in the 22nd Judicial Circuit of Missouri and officials from the City of St. Louis are responsible for these harms, as they employ policies and practices that imprison people on unaffordable money bail, deny them even the most basic procedural protections, and violate their fundamental constitutional right to pretrial liberty and their equal protection right not to be detained because of their poverty.

3. The Supreme Court has directed judges that pretrial detention should be a "carefully limited exception" in our legal system. *United States v. Salerno*, 481 U.S. 739, 755 (1987). Nevertheless, individuals arrested and charged in St. Louis City are subject to an unconstitutional system where they are denied any process to argue for their liberty. In fact, the first hearing on release conditions[1] only occurs when an individual obtains counsel. Because appointment of a public defender typically takes four to five weeks, those too poor to pay the monetary release conditions or to hire a private attorney are subjected to extended pretrial incarceration before they have *any* opportunity to contest their release conditions.

4. Conversely, wealthier individuals are released from custody almost immediately because they can pay the monetary conditions of release.

5. As a result, Plaintiffs' rights to equal protection under the law, as well as substantive and procedural due process, are systematically violated by Defendants. The City of St. Louis violates Plaintiffs' constitutionally protected rights by contributing to a system where arrestees are imprisoned without adequate process, including no assessment of their ability to pay, and no determination that pretrial detention is necessary to advance a compelling

---

[1] In the 22nd Judicial Circuit and other jurisdictions, various terms are used to refer to conditions of release. For the purposes of this complaint, "bail" is synonymous with "release conditions." The phrases "money bail," "secured money bail," "monetary bail," or "financial condition of release" refer to the requirement that a bail amount be paid upfront in order for a person to be released. The terms "unsecured bail," "unsecured bond," or "recognizance bond" refer to release upon a promise to pay an amount of money at a later date if they do not appear for court.

2

government interest. Specifically, the Bond Commissioner, a City employee, violates Plaintiffs' rights through his policy and practice of failing to assess detained individuals' economic circumstances or consider non-monetary conditions of release. He instead only recommends monetary release conditions when making recommendations to the Duty Judge, who formally sets conditions of release. The St. Louis Sheriff's department violates Plaintiffs' rights through its practice of telling individuals that they cannot speak to the court about their release conditions at their first appearances.

6.     The Defendant judges of the 22nd Judicial Circuit Court further violate Plaintiffs' rights by (1) setting arbitrary release conditions without any investigation into an individual's ability to pay financial release conditions, (2) issuing *de facto* detention orders without determining whether detention is necessary to advance a compelling government interest or if there exist less restrictive alternatives available, and (3) doing all of the foregoing without providing any process at all to the incarcerated individual to contest their jailing until weeks or months have passed and an attorney enters an appearance.

7.     As a result of Defendants' unconstitutional policies and practices, 85% of the over one thousand individuals locked in St. Louis City jails are there awaiting trial because they are too poor to pay for their release.

8.     Pretrial detention not only subjects these individuals to the unconscionable conditions in St. Louis' jails, but also significantly impacts their personal lives and jeopardizes their legal defense. The collateral consequences of pretrial incarceration are severe: pretrial detainees routinely suffer losses in employment, child custody, and housing and experience greater risks of physical and emotional illness, barriers to counsel, and—critically—statistically worse trial and sentencing outcomes than released individuals who were charged with the same

offense. *See, e.g.*, Paul Heaton, et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 STAN. L. REV. 711, 786-87 (2017).

9.     This is despite compelling evidence that alternatives to monetary release conditions are more effective in ensuring appearance for trial and reduce the risk of re-arrest before trial. Pretrial Justice Institute, *The Pretrial Services Agency For the District of Columbia: Lessons From Five Decades of Innovation and Growth*, 2 Case Studies 1, 2 (Aug. 2018), https://perma.cc/8KAD-TY5H ("The high nonfinancial release rate has been accomplished without sacrificing the safety of the public or the appearance of people in court. Agency data show that 90 percent of released people make all court appearances and that 91 percent complete the pretrial release period without any new arrests.").

10.     This lawsuit is brought by Plaintiffs David Dixon, Jeffrey Rozelle, Aaron Thurman, and Richard Robards (collectively, "Named Plaintiffs") in their individual capacity and as representatives of the class of individuals including all arrestees who are or will be detained in the Medium Security Institution (referred to as "the Workhouse") or the City Justice Center ("CJC"), operated by the City of St. Louis, post-arrest because they are unable to afford to pay a monetary release condition. Each named Plaintiff has already suffered over 10 days of incarceration without process due to Defendants' actions.

11.     On behalf of themselves and all others similarly situated, Plaintiffs seek a declaration from the Court that Defendants' policies and practices violate Plaintiffs' equal protection, substantive due process, and procedural due process rights. Plaintiffs further request the Court remedy these unconstitutional actions by issuing appropriate injunctive and declaratory relief that will ensure the substantive and procedural safeguards outlined below are followed and that individuals in St. Louis do not remain jailed based solely on their poverty.

12.     Plaintiffs further ask that this Court immediately take up their Motion for Temporary Restraining Order, and order the immediate release of the Named Plaintiffs unless they are provided the procedures outlined below, as the parties work to remedy these issues.

## JURISDICTION AND VENUE

13.     This is a civil rights action arising under 42 U.S.C. §1983 and 28 U.S.C. § 2201, *et seq*., and the Fourteenth Amendment to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

14.     Venue in this Court is proper pursuant to 28 U.S.C. §1391.

## PARTIES

15.     **Plaintiff David Dixon** is a 52-year-old Black man who lives in St. Louis. He has been incarcerated for the last 18 days solely because he cannot afford his $30,000 cash bond, set by Duty Judge Roither. Mr. Dixon's family struggles without him. He is the primary caregiver for his paralyzed Vietnam-vet uncle and his 2 sons. Mr. Dixon suffers from seizures and high blood pressure and has been denied adequate medical treatment while incarcerated. Mr. Dixon fears he will not make it out alive. After suffering for 6 days in a holding cell at St. Louis' City Justice Center ("CJC"), without a shower, sleep, or any medication, he now suffers at the Workhouse, unable to eat and in fear for his safety. Mr. Dixon was arrested on January 10, 2019, when the Court gave Mr. Dixon a two minute first appearance through a video monitor. Before the appearance, a sheriff deputy told him to "nod and say yes and come back out." The Bond Commissioner did not interview him regarding ability to pay monetary conditions of release nor learn relevant personal information prior making a bond recommendation or Mr. Dixon's first appearance. When Judge Roither announced his bond, Mr. Dixon expressed that he could not afford that amount. Judge Roither ordered Mr. Dixon's continued incarceration, gave him a new

court date, and told him to speak with an attorney. Mr. Dixon has applied for a public defender but still has not heard back.

16.    **Plaintiff Jeffrey Rozelle** is a 42-year-old Black man from St. Louis. Mr. Rozelle has been incarcerated 13 days without a hearing because he is too poor to pay the $15,000 cash bond set in his case by Duty Judge Roither. Mr. Rozelle has four teenage children who look up to him and rely on his care. He is suffering due to the conditions at the Workhouse, including the mold in the showers, rodents, and extremely cold temperatures. Mr. Rozelle saw Judge Roither through video for less than 2 minutes. Before his appearance, a Sheriff Deputy told him he could not say anything. The Bond Commissioner did not interview him regarding his ability to pay monetary conditions of release or learn relevant personal information prior making a bond recommendation or Mr. Rozelle's first appearance. At his first appearance, Mr. Rozelle tried to ask for a change in his release conditions, but the judge told him that he would have to wait until he retained counsel and filed a motion related to release conditions. Judge Roither ordered Mr. Rozelle to remain in custody unless he could pay $15,000. Mr. Rozelle attempted to immediately apply for a public defender but was told by officials at CJC that he would have to wait until he was transferred to the Workhouse to do so, six days later.

17.    **Plaintiff Aaron Thurman** is a 24-year-old Black man from St. Louis. He has been incarcerated for the last 13 days because he cannot afford his cash bond set at $30,000, cash only, by Duty Judge Hogan. Prior to his incarceration, Mr. Thurman moved back home to care for his sister who was just diagnosed with Stage IV breast cancer. Since he stays home to care for her full-time, he also cares for his siblings' children and his own 3 young daughters. Mr. Thurman struggles with his inability to support his family knowing that his family needs him home. See Ex. S, ¶¶ 3-7; Ex. T, ¶¶ 3-7; Ex. U, ¶¶ 3-8. On January 15th, Mr. Thurman saw Judge

6

Roither through a video monitor. Prior to this appearance, a Sheriff's deputy told him that he could not speak to the judge. His first appearance lasted less than 2 minutes, during which Judge Roither announced his charges and his bond, and asked him whether he was planning on applying for a public defender. Mr. Thurman was asked no further questions about his individual situation, including his ability to pay the bond, nor given an explanation for the bond set.  Judge Roither ordered Mr. Thurman to remain in custody unless he could pay $30,000. The Bond Commissioner did not interview Mr. Thurman regarding his ability to afford monetary conditions of release or learn relevant personal information prior to making a bond recommendation or Mr. Thurman's first appearance.  Mr. Thurman has applied for a public defender but has not heard back.

18.     **Plaintiff Richard Robards** is a 25-year-old white man from St. Louis. Mr. Robards has been incarcerated for 18 days because he is too poor to pay the $10,000, 10% secured cash bond set in his case by Duty Judge Roither. Mr. Robards is desperate to be released in order to care for his pregnant partner and to be present at the birth of their child, who is due in July. See Ex. V, ¶¶ 3-5; Ex. W, ¶¶ 3-4. Mr. Robards was not interviewed regarding his ability to afford monetary conditions of release nor to learn relevant personal information prior to his first appearance. Mr. Robards first appearance before Judge Roither lasted 2 minutes through a video monitor where he was told his charges and the bond amount set in his case. Mr. Robards wanted to explain his inability to afford his bond, but saw the judge cut people off if they tried to speak. At the conclusion of his hearing, the Judge ordered Mr. Robards to remain in custody unless he could pay for his release.

19.     **Defendant City of St. Louis** is responsible for setting policy regarding pretrial release through its Public Safety Director, the office of the Mayor, and most specifically through

the Bond Commissioner and the Defendant Sheriff.[2] As a city employee, the Bond Commissioner is directly responsible for recommending release conditions to the Duty Judge, and thus represents and implements the policies and practices of the City. The Bond Commissioner is responsible for determining what information to provide to the Duty Judge when making a recommendation and has a practice of not inquiring into ability to pay. He also has a practice of only recommending monetary conditions of release. The Sheriff's role is outlined below. The City is sued for injunctive and declaratory relief.

20.    **Defendant Sheriff Vernon Betts** is the head of the St. Louis Sheriff's Department and has authority over individuals in St. Louis City custody during the time of their first appearance before the court by video conference. The Sheriff and the City are liable for the Sheriff's unconstitutional policy and practice of having his deputies direct individuals in their custody not to speak and thereby not to challenge their release conditions during their first appearance before a judge. Sheriff Vernon Betts is sued in his official capacity for injunctive and declaratory relief.

21.    **Named Defendant Circuit and Associate Circuit Judges** are all judges in the 22nd Judicial Circuit Court of Missouri and are sued in their official capacity. Judge Hogan and Judge Roither, in their capacity as Duty Judge, are responsible for setting release conditions and have a practice of setting unaffordable release conditions without any process or findings, let alone constitutionally sound ones. Judge Hogan, Judge Roither, and Judge McCarthy, in their capacity as Judges presiding over Divisions 16, 25, and 26, are responsible for conducting first

---

[2] The "Bond Commissioner's Office" operated by the City of St. Louis was formerly known as the "Pre-Trial Services Office." The Bond Commissioner operates with the powers of its predecessor, which are outlined in 22nd Judicial Circuit Rule 67.1.3. The Bond Commissioner is a City of St. Louis employee. City of St. Louis, FY19-Line-Item-Judicial-as-adopted (budget), available at https://www.stlouis-mo.gov/government/ departments/budget/documents /upload/FY19-Line-Item-Judicial-as-adopted.pdf.

appearances, adopting release conditions set without any process or findings. Presiding Judge Ransom and Interim Presiding Judge Burlison, in their capacities as Presiding Judges in the 22nd Judicial Circuit Court oversee the court's policies and practices. During the first appearance, judges do not inquire into an individual's ability to pay financial release conditions, likelihood to appear for trial, or any countervailing government interests—in violation of those individuals substantive due process and equal protection rights. Judges are sued in their official capacity for declaratory relief.

22.     **Defendant Commissioner Dale Glass** is the Commissioner of the St. Louis Division of Corrections. Commissioner Glass directs the Division of Corrections and enforces the pretrial detention of individuals confined in the City's two jails. The Commissioner is liable for enforcing unconstitutional *de facto* detention orders. Commissioner Glass is sued in his official capacity for the purposes of ordering prospective injunctive relief.

## DEFENDANTS FAIL TO PROVIDE ANY CONSTITUTIONALLY MEANINGFUL PRETRIAL RELEASE PROCESS AND INDIVIDUALS REMAIN INCARCERATED DUE TO THEIR POVERTY

23.     Individuals enter St. Louis custody upon arrest by a law enforcement agency. Prior to issuance of a warrant, a monetary release condition is set by the Duty Judge based on a recommendation by the Bond Commissioner. When someone is arrested by police without a warrant, the Bond Commissioner will make a recommendation regarding release conditions to a Duty Judge who sets bond at some point prior to the individual's first appearance before a judge.

24.     The Bond Commissioner, when making a recommendation to the judge, will usually rely only on the individual's prior criminal record and the charges alleged against them. The Bond Commissioner does not inquire into the detained individual's ability to afford monetary conditions for their release, their ties to the community, or other relevant factors when making a recommendation. Ex. BB. In fact, the Bond Commissioner often does not even

interview the individual prior to making a recommendation. Ex. C, ¶ 8; Ex. D, ¶ 3; Ex. E, ¶ 6; Ex. F, ¶ 5; Ex. H, ¶ 6; Ex. I, ¶ 3; Ex. K, ¶ 2; Ex. L, ¶ 3; Ex. N, ¶ 3; Ex. O, ¶ 8; Ex. P, ¶ 6 . Despite not knowing whether any given arrestee is wealthy or poor, the Bond Commissioner has a policy or practice of virtually always recommending monetary conditions of release.

25.     The Duty Judge has a policy or practice of setting the initial release conditions based solely on information in the warrant application, information provided by the Bond Commissioner, and the Bond Commissioner's recommendation, without performing any independent inquiry. As a result, the median bond amount set in the city is $25,000—an amount far beyond most individuals' ability to pay—resulting in *de facto* orders of detention for poor people lasting weeks or months, while simultaneously allowing wealthy individuals to buy their freedom. In the vast majority of cases the initial condition set by the judge is a monetary cash-only bond that an individual must pay *in full* in order to be released.

26.     The first time an individual sees a judge is at their first appearance, which is held by video conference from CJC and usually within 48 hours of their arrest. Deputies who are overseen by Sheriff Betts maintain custody over individuals during their first appearances. Pursuant to a policy or practice of the Sheriff's Office, deputies  inform detained individuals that they are not allowed to speak or request a change in their release conditions during the first appearance. Ex. A, ¶ 3; Ex. B, ¶ 3; Ex. C, ¶ 3; Ex. D, ¶ 4; Ex. G, ¶ 5; Ex. H, ¶ 3; Ex. I, ¶ 4; Ex. J, ¶ 5; Ex. K, ¶ 3; Ex. Q, ¶ 3.

27.     As a result, the first appearance is limited to the judge reading the charges and informing the individual of the release conditions already set in their case. Detained individuals are given no opportunity to provide the judge with information about their ability to meet those release conditions. Individuals are not represented by counsel and are not allowed to speak to the

judge except to inform the judge whether they plan to retain counsel. This first appearance lasts only 1-2 minutes and is not on the record. Ex. A, ¶ 5; Ex. B, ¶ 3; Ex. C, ¶¶ 5-6; Ex. D, ¶¶ 5-6; Ex. E, ¶ 4; Ex. F, ¶ 6; Ex. G, ¶ 6; Ex. H, ¶¶ 4-5; Ex. I, ¶ 5; Ex. L, ¶ 3; Ex. M, ¶ 5; Ex. N, ¶ 4; Ex. O, ¶ 7; Ex. Q, ¶¶ 3-4.

28.     Further, if an individual dares to speak, the judge will inform them that the first appearance is not the appropriate time to talk about their release conditions. Judges have repeatedly told individuals that if they would like to challenge the conditions set, they must wait for an attorney to file a motion and cannot do so themselves. Ex. A, ¶ 5; Ex. M, ¶ 5.

29.     Indigent individuals are therefore denied *any* opportunity to challenge or request modification of their release conditions until a public defender enters on their case. This process takes an average of four weeks from the time of arrest due to the chronic underfunding of the Missouri State Public Defender system. Even after a public defender enters as counsel and files a motion to reduce bond, at least a week elapses before a judge hears the motion. *See, e.g.* Ex. DD, *St. v. Calvin Lamont Wiley, Jr.*, 1822-CR03442 (14 days between entry of public defender and bond reduction hearing); Ex. EE, *St. v. Dion Joseph Clerk*, 1822-CR03462 (12 days between entry of public defender and bond reduction hearing). Thus, indigent defendants remain incarcerated on average four to five weeks before they are given *any* opportunity to challenge or modify the release conditions set in their case. Poor individuals who do not qualify for a public defender, but also cannot afford to hire a private attorney, may face even longer delays waiting for a court determination that they are eligible for services by a public defender.

30.     Conversely, wealthier individuals can either immediately pay the set monetary amount or hire an attorney to quickly challenge their release conditions.

31.     Even when hearings are finally held regarding an individual's release conditions, such hearings fail to make findings on the individual's ability to afford the release conditions, the insufficiency of non-financial alternatives to monetary conditions of release, and why a particularly release condition is necessary to meet a compelling government interest.

32.     Empirical research indicates no correlation exist between monetary release conditions and an individual's likelihood to appear in court. The Bail Project - St. Louis has a 94.5% re-appearance rate for individuals they have bailed out since December 1, 2017. Ex. CC; *also see* Tim Schnacke, United States Department of Justice, National Institute of Corrections, Fundamentals of Bail: A Resources Guide for Pretrial Practitioners and a Framework for American Pretrial Reform (2014), available at http://www.clebp.org/images/2014-11-05_final_bail_fundamentals_september_8,_2014.pdf. Further, a decision-maker cannot determine risk to public safety based solely upon allegations of charges.

33.     Defendants' policies and practice regarding bond further violate Missouri state law requirements and Missouri Supreme Court rules. Mo. Rev. Stat. § 544.457; Mo. Rev. Stat. § 544.455; Mo. S. Ct. R. 33.05; Mo. S. Ct. R. 33.06.

34.     As the result of Defendants' policies and practices, indigent and poor detainees are subject to *de facto* orders of detention based solely on their economic circumstances.

35.     Defendants have long been aware that their policies and procedures violate St. Louis City detainees' equal protection, substantive due and procedural due process rights, but have failed to take action. As far back as 1990, the Eastern District of Missouri entered an order stating:

> [St. Louis City] detainees are not convicts; they are waiting for trial. Therefore, neither the State of Missouri nor the City of St. Louis can impose penal punishment upon any individual not yet proven guilty, in the absence of a specific judicial finding denying the individual defendant bail.

*Tyler v. United States*, 737 F.Supp. 531, 537 (E.D. Mo. 1990) (citing *Bell v. Wolfish*, 441 U.S. 520, 539 (1979); *Campbell v. Cauthron*, 623 F.2d 503, 505 (8th Cir. 1980)).

## ST. LOUIS' UNCONSTITUTIONAL PRETRIAL PRACTICES HARM INDIVIDUALS AND COMMUNITIES

36.     Due to the Defendants' unconstitutional policies and practices, less than 5% of individuals are ordered released without any monetary conditions. As a result, over one thousand individuals are detained in St. Louis *every day*—around 85% of which are being held pretrial and are therefore presumptively innocent—solely because they are too poor to pay the monetary release conditions imposed without any hearing, let alone a hearing that meets constitutional standards.

37.     The majority of people in jail pretrial are incarcerated at "the Workhouse" where they face unconscionable conditions, including but not limited to: extreme heat and cold, abysmal medical care, rat and cockroach infestations, snakes and mold. There is a documented history of inmate abuse by jail guards, deaths and suicides in the jail, and inadequate training of jail staff. *E.g.*, *Cody v. City of St. Louis*, No. 4:17-cv-2707 (E.D. Mo. Nov. 13, 2017); Ex. A, ¶¶ 10-15; Ex. B, ¶ 7; Ex. C, ¶ 16; Ex. D, ¶ 10; Ex. G, ¶ 10; Ex. H, ¶ 12; Ex. K, ¶¶ 6-7; Ex. L, ¶¶ 5-6; Ex. M, ¶¶ 3, 8-10; Ex. N, ¶ 7; Ex. Q, ¶ 7. Thus, Defendants force individuals who are too poor to pay for their freedom to suffer unnecessary and intolerable conditions of confinement because of their policies and practices.

38.     Prior to detained individuals' transfer to the Workhouse, individuals are kept in a holding cell at CJC without access to showers or medical care. These individuals, some of whome are held nearly a week before transfer are denied access to applications for a public

defender until their transfer to the Workhouse. Ex. A, ¶¶ 2, 16; Ex. B, ¶ 4; Ex. E, ¶ 2; Ex. F, ¶ 3; Ex. H, ¶ 13; Ex. J, ¶ 4; Ex. M, ¶ 8; Ex. O, ¶ 2; Ex. P, ¶¶ 2-5.

39.     Further, it is well documented that pretrial incarceration harms individuals' lives far beyond their loss of liberty and the conditions they face in jails. Collateral consequences of pretrial incarceration include:

- Loss of income and wages when individuals lose their jobs because of their incarceration;

- Loss of housing and missed payments on bills because individuals cannot work or pay bills while incarcerated;

- Loss of physical and/or legal custody of children;

- An increase of mental illness symptoms because conditions in jail can put an individual under a lot of stress and restrict access to needed medications, exacerbating or even causing mental illness; and

- Increased risk of assault, including sexual assault, are shockingly common in St. Louis jails, especially in the first few days of incarceration.

Close the Workhouse, A Plan to Close the Workhouse & Promote a New Vision for St. Louis (2018), https://www.closetheworkhouse.org/new-close-the-Workhouse-report; Melissa Neal, Bail Fail: Why the U.S. Should End the Practice of Using Money for Bail, Justice Policy Institute (2012), http://www.justicepolicy.org/uploads/justicepolicy/documents/bailfail.pdf.

40.     In addition, merely being detained pretrial can have a significant impact on the legal outcome of an individual's case. Detained people have a harder time preparing for their defense, gathering evidence and witnesses, and meeting with their lawyers. It is also well documented that those detained pretrial face worse outcomes at trial and sentencing than those released pretrial, even when charged with the same offenses. Data collected by the Bail Project - St. Louis demonstrates the stark difference in outcomes. 53% of individuals they have bailed out see their cases dismissed. *See* Ex. CC. Nationally, individuals incarcerated pretrial have a 13% increased chance of being found guilty, have a 21% increased chance they will plead guilty, are

four times more likely to be sentenced to jail times, and have three times longer jail sentences (an average of 4.6 months longer) than those free while waiting for their trial. Christopher Lowenkamp, et al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes,* Laura and John Arnold Foundation (November, 2013), available at https://university.pretrial.org/viewdocument/investigating-the-im; Megan Stevenson (2018), Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes. The Journal of Law, Economics, and Organization, Vol. 34, Issue 4 (511-542). https://doi.org/10.1093/jleo/ewy019. *Also see* Harvey, T. B., Rosenfeld, J. H., & Tomascak, S. (2017). Right to Counsel in Misdemeanor Prosecutions After Alabama v. Shelton: No-Lawyer-Courts and Their Consequences on the Poor and Communities of Color in St. Louis. Criminal Justice Policy Review, 29(6-7), 688-709. doi:10.1177/0887403417743301.

41.     Thus, the policy or practice of issuing *de facto* detention orders by setting unaffordable monetary bail without process or requisite findings results in significant collateral consequences to individuals based solely on their economic status.

### Class Action Allegations

42.     The named Plaintiffs bring the Claims in this action, on behalf of themselves and all others similarly situated, as a class action under Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(2).

43.     Under Federal Rule of Civil Procedure 23(a), certification of a class is appropriate where: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

44.     This class is composed of all arrestees who are or will be detained in the Workhouse or CJC, operated by the City of St. Louis, post-arrest because they are unable to afford to pay the monetary release conditions.

45.     This action is brought and may properly be maintained as a class action pursuant to Rule 23(a)(1)–(4) and Rule 23(b)(2) of the Federal Rules of Civil Procedure. This action satisfies the requirements of numerosity, commonality, typicality and adequacy. Fed. R. Civ. P. 23(a).

## Numerosity and Impracticability of Joinder

46.     The proposed class is composed of all individuals who are detained in St. Louis' custody pretrial without an opportunity to challenge their release conditions and without any inquiry into their ability to pay the preset secured bond amounts.

47.     On average, 85% of individuals in St. Louis' jail are incarcerated while awaiting their trial because they cannot afford monetary conditions of their bail. *Monthly Report,* July 2018, St. Louis City Department of Public Safety, Division of Corrections, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/upload/JULY-2018-REPORTING-OF-STATISTICS.pdf.; Close the Workhouse, A Plan to Close the Workhouse & Promote a New Vision for St. Louis (2018), https://www.closetheworkhouse.org/new-close-the-workhouse-report (last visited January 27, 2019). The vast majority of individuals who are incarcerated pretrial in St. Louis are impoverished. The number of current and future individuals subject to Defendants' policies and practices who will remain incarcerated and be unconstitutionally stripped of their liberty—if it is not enjoined—numbers well into the thousands every year.

48.     Joinder is impracticable because of the numerosity of the class and their impoverished economic status.

**Commonality**

49.     Common questions of law and fact exist as to all members of the class. The named Plaintiffs seek common declarative and injunctive relief concerning whether Defendants' wealth-based policies, practices, and procedures violate the rights of the class members, and relief mandating that the Defendants stop these constitutional violations.

50.     The Plaintiffs' claims raise common legal and factual questions arising from one central set of policies and practices: Defendants' post-arrest procedurally deficient bail setting and wealth-based detention system. Defendants operate this system in materially the same manner every day with respect to all individuals arrested and held in St. Louis' pretrial custody. Resolution of these legal and factual issues will determine whether all of the members of the class are entitled to the constitutional relief that they seek.

51.     Among the most important common questions of fact for the class are:

   a.   Whether Defendants have a policy and practice where Defendants set pretrial release conditions without process or a hearing;

   b.   Whether, when, and how any official determines what conditions of pretrial release should be and whether, for example, any official considers ability to pay, makes findings concerning ability to pay, and offers non-monetary release conditions for those unable to pay;

   c.   What standard post-arrest procedures created, implemented, and enforced by the Defendants apply to arrestees; for example, whether Defendants use any other

17

alternate procedures for promptly releasing indigent people determined otherwise eligible for release but who are unable to afford a monetary payment;

d.  How long individuals arrested must wait in jail after arrest before they have an opportunity to challenge pretrial release conditions, raise their inability to pay for their release or to request alternative, non-monetary conditions;

e.  How long individuals arrested must wait to be appointed an attorney that may challenge their pretrial detention;

f.  Whether the Sheriff instructs defendants not to speak before the video conference at which their charges are read and release conditions are announced;

g.  The role of the City Bond Commissioner's Office in the setting of bail and conditions of release, whether any individualized analysis occurs, and whether and how inability to pay is considered;

h.  The standards and factors used by judges to set release conditions; and

i.  Any supervision or training given to City employees and used to help determine release conditions.

52. Among the most important common questions of law are:

a.  Whether requiring an individual to pay money to secure release from pretrial detention without an inquiry into or findings concerning the individual's present ability to pay the amount required, the need for detention, and less restrictive alternative release conditions, violates the Fourteenth Amendment's Due Process and Equal Protection clauses; and

b.  Whether it is lawful to impose a monetary release condition that operates as a *de facto* order of pretrial detention because of a person's inability to pay without

complying with the substantive findings, legal standards, and procedures required for issuing and enforcing a *de facto* order of preventive detention.

    c.   Whether the setting of pretrial release conditions without an individual's ability to consult and be represented by Counsel violates the Fourteenth Amendment's Due Process clause;

## Typicality

53.    The Named Plaintiffs' claims are typical of the claims of the other members of the class. Each class member is incarcerated in St. Louis custody pretrial and remains incarcerated based on the same lack of due process, suffering the same injury because Defendants refuse to comply with basic due process constitutional requirements. Class members all remain confined in jail because they cannot afford to pay the Defendants' secured money bail. The answer to whether the Defendants' policies and practices are unconstitutional will determine the specific claims and specific relief sought by the Named Plaintiffs and every other class member. All class members seek the same declaratory and injunctive relief.

## Adequacy

54.    The Named Plaintiffs are adequate representatives of the class because their interests in the vindication of the legal claims they raise are entirely aligned with the interests of the other class members, each of whom has the same basic constitutional claims. The Named Plaintiffs are members of the class, and their interests do not conflict with those of the other class members.

55.    There are no known conflicts of interest among members of the proposed class. All of the members of the class have a similar interest in vindicating their constitutional rights in the face of Defendants' pay-for-freedom and no process post-arrest detention system.

56.     Plaintiffs are represented by attorneys from ArchCity Defenders, the Advancement Project, Civil Rights Corps, and the Institute for Constitutional Advocacy and Protection. Plaintiffs' counsel have experience litigating complex civil rights matters in federal court and extensive knowledge of both the details of Defendants' unconstitutional actions and the relevant law. Counsels' relevant qualifications are more fully set forth in the contemporaneously filed Motion for Class Certification.

57.     The combined efforts of class counsel have so far included extensive investigation into money bail schemes and pretrial release condition processes over the last year, including dozens of interviews with individuals in St. Louis' pretrial jail, conversations with attorneys practicing in state courts throughout the region, community members, statewide experts in the functioning of state and local courts, empirical researchers, and consultation with national experts in constitutional law, post-arrest procedure, law enforcement, judicial procedures, criminal law, pretrial services, and jails. Local counsel has additionally represented individuals in state criminal court who are detained pretrial.

58.     Counsel have devoted significant time and resources to becoming intimately familiar with Defendants' unconstitutional pretrial incarceration system and related laws. The interests of the members of the class will be fairly and adequately protected by the Plaintiffs and their attorneys.

### Injunctive or Declaratory Relief — Rule 23(b)(2)

59.     Class-action status is appropriate because the Defendants, through the policies, practices, and procedures that make up its wealth-based post-arrest detention system, have acted in the same unconstitutional manner with respect to all class members.

60.     The class therefore first seeks declaratory relief, requesting this Court find that current processes and practices relating to the conditions of pretrial release in the St. Louis City courts violate individuals' rights.

61.     The class also seeks injunctive relief to institute a constitutional custody-process and to prevent the Defendants from detaining individuals pretrial who have not been afforded this process and who remain incarcerated because they cannot afford cash payments and the judges have failed to consider their economic circumstances or the availability of less restrictive pretrial release conditions.

62.     Because the putative class challenges the Defendants' system as unconstitutional through declaratory and injunctive relief that would apply the same relief to every member of the class, Rule 23(b)(2) is appropriate and necessary.

63.     Further, a class action is a superior means, and the only practicable means, by which the Named Plaintiffs and unknown Class members can challenge the Defendants' unconstitutional actions and obtain the necessary immediate declaratory and injunctive relief sought for themselves and all other members of the class.

### Appointment of Class Counsel  Rule 23 (g)

64.     Fed. R. Civ. P. 23(g). Federal Rule of Civil Procedure 23(g) requires that the court appoint class counsel for any class that is certified. Fed. R. Civ. P. 23(g)(1). Class counsel must "fairly and adequately represent the interests of the class."

65.     For reasons fully set forth in the Brief in Support of Motion for Class Certification, undersigned counsel meet the factors the court must consider under Rule 23 (g): 1) "the work counsel has done in identifying or investigating potential claims in this action"; 2) "counsel's experience in handling class actions, other complex litigation, and the types of claims

asserted in the action;" 3) "counsel's knowledge of the applicable law;" and 4) "the resources that counsel will commit to representing the class."

## CLAIMS FOR RELIEF

### COUNT I

**Defendants Violate Plaintiffs' Fourteenth Amendment Rights to Equal Protection and Due Process through a Policy or Practice that Jails Individuals Based on their Poverty under 42 U.S.C. § 1983**
**By Named Plaintiffs on behalf of themselves and**
**all others similarly situated, against all Defendants**

66.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

67.     Plaintiffs have a right against wealth-based detention. In the pretrial detention context, courts have regularly found that setting arbitrary monetary release conditions that exceed an individual's ability to pay violates the equal protection clause. The Fourteenth Amendment's Equal Protection and Due Process Clauses prohibit jailing a person because of her inability to make a monetary payment. *Bearden v. Georgia*, 461 U.S. 660 (1983).  Because Plaintiffs are detained based solely on their inability to pay, heightened scrutiny is implicated. *ODonnell v. Harris Cty.*, 892 F.3d 147, 161 (5th Cir. 2018) ( "[T]he Supreme Court has found that heightened scrutiny is required when criminal laws detain poor defendants *because of* their indigence."); *Tate v. Short*, 401 U.S. 395, 397-99 (1971); *Williams v. Illinois*, 399 U.S. 235, 241-42 (1970).

68.     Defendants violate Plaintiffs' substantive rights by enforcing against them a system of wealth-based detention that keeps them in jail solely because they cannot afford to make a monetary payment.

69.     Defendants do not inquire into an individual's ability to afford monetary release conditions or consider less restrictive alternatives before recommending or setting unaffordable monetary bail.

70.     Defendants' actions fail any form of scrutiny, as empirical research indicates no correlation between monetary release conditions and an individual's likelihood to appear in court.

71.     Here, Defendants' policies and practice result in poor arrestees being detained when similarly situated wealthy arrestees are not, in violation of the Fourteenth Amendment. The Commissioner of Corrections and Sheriff enforce these unconstitutional detention orders. Thus Defendants deny individuals their equal protection and due process rights.

## COUNT II

**Defendants Violate Plaintiffs' Fourteenth Amendment Substantive Due Process Right to
Liberty under 42 U.S.C. § 1983
By Named Plaintiffs on behalf of themselves and
all others similarly situated, against all Defendants**

72.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

73.     Defendants, acting under color of law, deny pretrial detainees their constitutionally protected right to liberty without any compelling state interest.

74.     It is well settled that freedom from imprisonment "lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 679, 690 (2001); *Foucha v. Louisiana*, 504 U.S. 117, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."). Pretrial detention infringes upon this right and may only be applied if it is "narrowly focuse[d]" to serve "compelling" interests.  *United States v. Salerno*, 481 U.S. 739, 750 (1987).

75.     The state's interest at the pretrial bond stage is limited to ensuring the accused will appear for trial and protecting the public from danger associated specifically with that individual's release. *Maryland v. King,* 569 U.S. 435, 452-54 (2013).

76.     Here, the City's Bond Commissioner and individual judges fail to consider a particular detainee's likelihood to appear or whether that individual poses any danger to the community, and make no findings regarding the necessity of detention, before setting *de facto* detention orders through imposition of unaffordable monetary conditions of release. The Commissioner of Corrections and Sheriff enforce these unconstitutional detention orders. Thus Defendants deny pretrial detainees their fundamental right to liberty in the absence of any compelling government interest and in violation of their substantive due process rights.

## COUNT III

**Defendants Violate Plaintiffs' Fourteenth Amendment Right to Procedural Due Process 42 U.S.C. § 1983
By Named Plaintiffs on behalf of themselves and
all others similarly situated, against all Defendants**

77.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

78.     Defendants provide absolutely no process before detaining individuals for weeks on unaffordable monetary release conditions. No hearing occurs, much less a hearing with sufficient process. Since no hearing occurs, no determination is made that any government interests require detention, in violation of Plaintiffs' procedural due process rights.

79.     Before an individual may be detained pretrial, procedural due process requires an individual be given the opportunity to be heard "at a meaningful time and in a meaningful

manner" before being deprived of liberty. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citing *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *Grannis v. Ordean*, 234 U.S. 385, 394 (1914)).

80.     Defendants' total lack of procedures—including no notice that a hearing will occur, no notice that the issue at the hearing will be whether the individual arrested is a flight risk or poses a danger to the community, no hearing with the opportunity to present evidence and cross-examine witnesses, and no hearing with counsel present—flagrantly violates the Fourteenth Amendment.

81.     Individuals who qualify for public defenders remain incarcerated an average of 4-5 weeks before they are given any hearing to challenge or modify their release conditions. Individuals who do not qualify for the public defender, but cannot afford to hire a private attorney, fair even worse—often being denied an opportunity to address their release conditions or discuss their financial status even longer. Conversely, wealthier individuals can obtain almost immediate release or obtain counsel to immediately challenge release conditions.

82.     Defendant Judges' failure to provide any process until an individual retains an attorney, combined with the setting of bond amounts unrelated to an individual's ability to pay, denies Plaintiffs' their fundamental right to liberty without procedural due process. The Commissioner of Corrections and Sheriff enforce these unconstitutional detention orders.

### Requests for Relief

WHEREFORE, Plaintiffs and the other Class members request this Court issue the following relief:

A.     A declaratory judgment that Defendants violate the Named Plaintiffs' and class members' constitutional rights by issuing detention orders without due process;

B.     A declaratory judgment that Defendants violate the Named Plaintiffs' and class members' constitutional rights by operating a system of wealth-based detention that keeps them in jail because they cannot afford to pay monetary conditions of

release without an inquiry into or findings concerning ability to pay, without consideration of non-financial alternatives, and without findings that a particular release condition—or pretrial detention—is necessary to meet a compelling government interest;

C. A declaratory judgment that when Defendants are determining conditions of release, an individualized determination on release conditions must occur promptly and at an individual hearing with the following procedures:

- Defendants must provide notice to the individual arrested that financial information will be collected and must explain the significance of the financial information to be collected;

- Defendants must determine each individual's ability to pay money bail and the amount of money they can afford;

- The individual arrested must be given an opportunity to be heard at the first opportunity concerning their ability to afford money bail and what non-monetary release conditions, if any, are necessary. The individual must have the opportunity to present evidence, make argument concerning those issues, and to contest any evidence or argument offered by the government concerning those issues;

- The judge conducting the hearing must make substantive findings on the record about why an individual's continued incarceration is warranted and that no less restrictive alternatives to detention address the state's concerns;

- The individual must be provided free counsel at the hearing;

D. A declaratory judgment that the Sheriff and Commissioner of Corrections must not enforce any order requiring secured money bail or a monetary release condition that was imposed prior to an individualized hearing and that is not accompanied by a record showing that the procedures and findings described above were provided;

E. An order permanently enjoining Defendants from operating and enforcing a system of wealth-based detention that keeps the Named Plaintiffs and class members in jail because they cannot afford a monetary release condition without an inquiry into or findings concerning ability to pay, without consideration of non-financial alternatives, and without any findings that a particular release condition—or pretrial detention—is necessary to meet a compelling government interest.

F. An order permanently enjoining Defendants from operating and enforcing pretrial detention without constitutionally valid process that complies with the above outlined process;

G. An order directing Defendant Sheriff not to instruct individuals in their custody to refrain from speaking at their hearings.

H.  A temporary restraining order requiring the Sheriff and Commissioner of Corrections to release the Named Plaintiffs unless they are provided the procedures stated above;

I.  Any other order and judgment this Court deems necessary to permanently enjoin Defendants from implementing and enforcing a system of wealth-based pretrial detention that keeps arrestees in jail because they cannot afford a monetary release condition without an inquiry into or findings concerning ability to pay, without consideration of non-financial alternatives, and without any findings that a particular release condition—or pretrial detention—is necessary to meet a compelling government interest;

J.  An order certifying the class defined above;

K.  An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other relief this Court deems just and proper.

Dated: January 28, 2019                              Respectfully submitted,

                                        By:/s/ *Sima Atri*_____
                                            ARCHCITY DEFENDERS, INC.
                                            Blake A. Strode (MBE #68422MO)
                                            Michael-John Voss (MBE #61742MO)
                                            Jacqueline Kutnik-Bauder (MBE # 45014MO)
                                            Sima Atri (MBE #70489MO)
                                            John M. Waldron (MBE #70401MO)
                                            440 N. 4th Street, Suite 390
                                            Saint Louis, MO 63102
                                            855-724-2489
                                            314-925-1307 (fax)
                                            bstrode@archcitydefenders.org
                                            mjvoss@archcitydefenders.org
                                            jkutnikbauder@archcitydefenders.org
                                            satri@archcitydefenders.org
                                            jwaldron@archcitydefenders.org

                                            ADVANCEMENT PROJECT
                                            /s/ *Thomas B. Harvey*
                                            Thomas B. Harvey (MBE #61734MO)
                                            Derecka Purnell
                                            D.C. Bar No. 252634 (*pro hac vice* application forthcoming)
                                            1220 L Street, N.W., Suite 850 Washington, DC 20005
                                            Tel: (202) 728-9557

Fax: (202) 728-9558
tharvey@advancementproject.org

**INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION (ICAP)**
/s/ *Seth Wayne*
Seth Wayne
D.C. Bar No. 888273445 (*pro hac vice* application forthcoming)
Nicolas Riley*
N.Y. Bar No. 5039607 (*pro hac vice* application forthcoming)
Robert Friedman
D.C. Bar No. 1046738 (*pro hac vice* application forthcoming)
Institute for Constitutional Advocacy and Protection
Georgetown University Law Center
600 New Jersey Ave. NW
Washington, D.C. 20001
Tel: 202-662-9042
sw1098@georgetown.edu
rdf34@georgetown.edu
nr537@georgetown.edu

* Admitted solely to practice law in New York; not admitted in the District of Columbia. Practice is limited pursuant to D.C. App. R. 49(c)(3).

**CIVIL RIGHTS CORPS**
/s/ *Alec Karakatsanis*
Alec Karakatsanis
D.C. Bar No. 999294 (Pro Hac Vice Application forthcoming)
Civil Rights Corps
910 17th Street NW, Suite 200
Washington, DC 20006
Tel: 202-599-0953
Fax: 202-609-8030
alec@civilrightscorps.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of January, 2019, I electronically filed the foregoing with the clerk of the court for the U.S. District Court, Eastern District of Missouri, using the electronic case filing system of the Court. The Summons and Complaint will be served in accordance with the Federal Rules of Civil Procedure.

By:  /s/ Sima Atri